WIGGINTON, Judge.
Defendant seeks review of a judgment of conviction based upon a jury verdict finding him guilty of manslaughter. His principal attack on the judgment centers upon the trial court’s denial of his motion for a directed verdict made at the conclusion of the evidence. He contends that a review of the record affirmatively demonstrates that there is no competent evidence from which an impartial jury could reasonably find that he was guilty beyond a reasonable doubt of the crime for which he has been convicted.
Appellant was informed against in the Court of Record of Escambia County and charged with the second degree murder of his 2%-month-old infant son. Upon trial, the jury found him guilty of manslaughter, coupling its verdict with a recommendation of leniency. It is from the judgment and sentence of 10 years imprisonment that this appeal is taken.
Early in the morning of the day in question the police were called to the apartment occupied by appellant, his wife, and three small children. Upon entering, the officer found appellant holding in his arms his 21/^-month-old infant son. Appellant expressed the belief that the child was dead, whereupon the officer called an ambulance and had the baby taken to the hospital where he was pronounced dead upon arrival. The only persons in the apartment when the officer arrived at about 2:10 a. m. were appellant, his twin 2j4-month-old sons, and a 16-month-old daughter, the mother being absent at her work. Appellant appeared to be calm and rational, and the evidence affirmatively established that *559 he had not been drinking- nor under the influence of any other stimulants. Appellant was asked to accompany the investigating officer to the police headquarters so they could take from him a statement as to the circumstances surrounding the death of the child.
After arriving at the headquarters appellant was advised of his constitutional rights against self-incrimination, following which he voluntarily made a recorded statement to the investigating officers. In his statement appellant related that he heard the baby crying so he took him from his crib into the living room, changed his diapers, and warmed a bottle of milk with which to feed him. He stated that after giving the baby his bottle, he took him in his arms and started walking back into the bedroom; that as he approached the doorway he swung his body around in order to avoid tripping over the corner of a playpen which protruded into the passageway and, in doing so, the baby’s head accidentally struck the door molding or facing; that the baby started crying so appellant took him into the lighted kitchen where he carefully examined his head but found no cuts, bruises, or abrasions. Believing that the child was all right, he then took him back into the bedroom and placed him in bed with his bottle, following which the baby went to sleep. It was some hours later that appellant again heard a gurgling sound coming from the child, and upon observing him on this occasion he appeared to be gagging, pale and weak. Appellant attempted to revive the baby by mouth-to-mouth resuscitation and placing cold towels on his head, but when this failed he became apprehensive and immediately called his wife at her work asking that she come home because of the child’s condition.
After making this statement, a police officer called the hospital and talked to the admitting doctor, relating the statement made by appellant as to how the injury to the child occurred. When the admitting doctor expressed an offhand opinion that the injury suffered by the child could not have happened in the way appellant described it, the police officer became suspicious for the first time that appellant had committed some criminal act. After interrogating appellant further as to whether the child had been struck in any manner, appellant acknowledged that earlier in the evening he had become upset over a continuing controversy and personal conflict he had with some next-door neighbors and that, while in such upset condition, he had hit the child on the back of the head. The police immediately had appellant make a second recorded statement containing this additional fact. It was on the basis of this statement that appellant was informed against for second degree murder, tried, and convicted.
At the trial the State called as an expert witness the pathologist who performed an autopsy on the child’s body after death. He testified that he found no outward or external signs of any injury to the child. The skin was not broken nor were there any lacerations or contusions. His examination revealed a 10 centimeter semicircular line fracture in the left temporal and parietal region of the child’s head. He found a hemorrhage between the bone and the dura and also between the dura and the brain, coupled with evidence of increased intracranial pressure. This expert expressed the opinion that the fracture found was caused by a blunt instrument coming in contact with the child’s head with some degree of severity. He was unable to express an opinion as to whether the wound resulted from the child’s head coming in contact with a stationary object or whether it was a moving object which struck the child. When told in the form of a hypothetical question appellant’s description of how the injury occurred by the child’s head striking the door molding as he attempted to enter the bedroom, the doctor was asked whether the injury caused in that manner could have resulted in the type of trauma disclosed by his autopsy, to which he responded that such would be possible. He reiterated in response to further questions *560 that he was unable to state whether the fracture found in the child’s head was or was not the result of an impact against the door molding.
Appellant took the stand and testified in his own behalf. He repeated to the court and jury the same facts and circumstances which he had given to the police officers on the day of his arrest following the death of his child. He candidly admitted having told the officer that earlier in the evening on the day in question he had become upset about the trouble he was having with his neighbors and had hit the child on the back of the head. He explained this by testifying that when he used the word “hit” he had made a poor choice of words for he meant that he had only “tapped” the child on his head with his open hand at a time when the child was crying and in an effort to comfort and console him so that he would stop crying. He insisted that it was only a gentle tap intended to reassure the child and comfort him, and the reason he omitted this fact from his original statement first given the officers was that he had attached no significance to it because it could not have resulted in any injury to the child. In addition to the foregoing testimony, the State sought to discredit appellant and cast suspicion upon his intentions on the night in question by attempting to prove that the children had been neglected from time to time by their parents who permitted waterbugs and roaches to run free in the house and had not kept the children as clean as the witness thought they should be. If such conditions existed, they would normally have been such as should have been corrected by the children’s mother, however, the penalty for such default was nevertheless visited upon appellant, the father. The foregoing is a fair summary of all credible evidence in the record upon which the jury could reasonably have found appellant guilty of any criminal offense.
The only evidence to which the State can point as support for the charge against appellant, or for the offense of which he has been adjudged guilty, is appellant’s own statement that he “hit” his child on the back of the head earlier in the evening preceding the child’s death some several hours later. To agree that this evidence is sufficient to prove beyond a reasonable doubt that appellant is guilty of some degree of murder or the unlawful homicide of which he stands convicted requires the indulgence in an inference that he struck his child with force and violence, which inference is contrary to the positive and unimpeached testimony standing in the record. There is no evidence that any blow which might have been administered by appellant’s open hand on the back of his child’s head was of sufficient severity to cause the skull fracture which the autopsy revealed. To infer that such “hit” could have caused the injury is contrary to the expert testimony in the record which unequivocally establishes that the injury was caused by a blunt instrument coming in contact with the child’s head with severe force. Such inference is also contrary to the positive testimony of the father that when he used the word “hit” to describe his actions toward the child, he meant that he “tapped” the child on the head as a gentle and reassuring means of comforting the child so that he would stop crying. The expert medical testimony also acknowledges the possibility that the injury to the child’s head could have been caused by coming in contact with the door molding with severe force in the manner testified to by appellant. The inference which the jury would be required to indulge in order to find appellant guilty is neither logical nor reasonable. One would be forced to reject the most basic instincts of human behavior to conclude that a sane parent, free of artificial influences and without provocation or reason, would intentionally strike his 2y¿-month-old baby on the head with such force and violence as to fracture his skull and cause his death. There is no evidence that appellant ever abused his children on any occasion prior to the time in question, nor does the record contain any evidence of provocation which reasonably could have *561 caused appellant to have committed the unlawful act for which he stands convicted. On the contrary, the record reveals without contradiction that throughout the night and early morning hours appellant exhibited tenderness and concern toward both his twin baby sons by the attention he paid in repeatedly attending them when they cried, changing their diapers and heating their bottles of milk to feed them when they were hungry.
In the case of Miller v. State [1] our Supreme Court said:
“To be considered as evidence inferences drawn from admitted or proven facts must logically flow from the facts so admitted or proved. An illogical or unreasonable inference does not have the force of evidence — it barely has the dignity of speculation or conjecture. It is only those inferences that naturally, logically and lawfully flow from an admitted or proven fact that should ever be considered in the category of evidence on the basis of which judgments of courts must rest. . .
The court very properly charged the jury on the law of circumstantial evidence. Since there was no direct evidence that any criminal action by appellant toward his child resulted in the latter’s death, the State was forced to rely on circumstantial evidence from which the necessary facts would have to be inferred. The rule has been uniformly adhered to in this state that before there can be a conviction of homicide on circumstantial evidence, the evidence must be not only consistent with guilt but also inconsistent with any reasonable hypothesis of innocence.[2] Considering the evidence in a light most favorable to the jury’s verdict it cannot be said as a matter of law that the totality of the evidence is consistent with appellant’s guilt and' inconsistent with any reasonable hypothesis of his innocence. It is our view and we so hold that the trial court erred in submitting this case to the jury and in denying appellant’s motion for a directed verdict at the conclusion of the evidence. The judgment appealed is accordingly reversed and the cause remanded with directions that appellant be discharged.
SPECTOR, C. J., and CARROLL, DONALD K., J., concur.

. Miller v. State (Fla.1954), 75 So.2d 312, 315.

. 16 Fla.Jur. 421, 422, Homicide, § 76.